## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SANDRA FISHMAN** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.    16-1372** |
| | : | |
| **STATE FARM FIRE AND CASUALTY** | : | |
| **COMPANY** | : | |

### MEMORANDUM

**SCHMEHL, J.**                                                          **November 6, 2017**

        Plaintiff brought this action, claiming the Defendant breached the terms of a homeowners insurance contract it maintained with Plaintiff when it denied coverage for damage to the roof of Plaintiff's residence. Plaintiff alleged that she suffered a sudden and accidental loss and damage to the roof as the result of hail and wind. The case was tried to the Court sitting without a jury. For the reasons that follow, the Court finds in favor of the defendant and against the Plaintiff.

        Prior to trial, the parties stipulated to the following facts:

1. Plaintiff Sandra J. Fishman ("Plaintiff ') lives [in a house] located at 1402 Farr Road, Reading, Pennsylvania 19211-1714 ("Property").

2. On May 22, 2014, the Property was insured by State Farm Fire and Casualty Company Insurance Homeowner Policy 78-EB-0308-2 ("Policy").

3. The Property has a slate roof.

4. It was reported to State Farm that the Property was damaged as a result of a storm on May 22, 2014 involving reported hail and wind damage to the roof and gutters at the Property.

5. The loss was reported to State Farm by Plaintiff on September 30, 2014.

6. Plaintiff retained the services of Gillespie Contracting Inc. ("Gillespie") related to the damages and repairs to the slate roof.

7. On October 15, 2014, State Farm representative George Dickey ("Dickey") inspected the Property with Eric Moe ("Moe") of Gillespie.

8. Based on his inspection, Dickey prepared an initial $12,661.94 Replacement Cost Value ("RCV") estimate with an Actual Cost Value ("ACV") of $7,657.28, and, after applying depreciation ($4,747.68) and the deductible ($500.00), Dickey issued a $7,657.28 check to Plaintiff and Wells Fargo Bank.

9. On October 16, 2014, after review of the steep roof pitch, Dickey increased the State Farm estimate to $13,029.53 RCV and issued a second check to Plaintiff and Wells Fargo in the amount of $124.57.

10. The October 16, 2014 State Farm estimate provides for repairs to limited areas of the Property's roof.

11. On April 29, 2015, Gillespie prepared an April 29, 2015 Proposal which provided a $85,186.56 RCV estimate with additional supplements costs of $4,991.50, for a total of $90,178.06 RCV ("Gillespie Proposal").

12. The Gillespie Proposal provides for the replacement of the Property's

entire slate roof.

13. On May 27, 2015, a second inspection of the Property was performed by State Farm specialist Marvin A. Moore ("Moore") and Gillespie representatives, Moe and Caleb Arnwine ("Arnwine").

14. The purpose of the second inspection was to reconcile the price differences between State Farm's $13,029.53 RCV estimate and Gillespie's $90,178.06 RCV estimate.

15. The May 27th inspection did not result in reconciliation of the price differences.

16. As a result of the difference between the State Farm estimate and the Gillespie estimate, State Farm retained independent slate roofing expert Joseph C. Jenkins ("Jenkins"), to inspect the Property's slate roof and provide an opinion regarding any damage to the roof, the cause of the damage, and an estimate for repairs related to hail or wind damage to the Property's roof.

18. Jenkins inspected the Property's roof on September 10th and 11th, 2015 with representatives of both State Farm and Gillespie present for the inspection. **As a result of his inspection of the Property, Jenkins prepared an October 9, 2015, report regarding the cause of the alleged damages to the Property's roof.**

19. Jenkins' Report concluded that the damages to the slate roof were not hail damages.

20. Based on Jenkins' Report, State Farm sent an October 16, 2015 letter denying further coverage for the May 22, 2014 loss.

21. The parties agreed that the only witnesses to be called at trial were Moe of Gillespie (for the plaintiff) and State Farm's retained slate roofing expert, Jenkins (for the defendant).

22. There are two issues for the Court to determine:

    a. Whether the reported damages to the slate roof at the Property were the result of the May 22, 2014 hail storm; and if so,

    b. The amount of damages to be awarded to Plaintiff.

(ECF 28.)

After hearing testimony, the Court makes the following Findings of Fact:

1. Moe testified that he is senior project manager for Gillespie and has been in the roofing industry for eight and a half years. (N.T. 11, 12.)

2. Moe did not prepare an actual expert curriculum vitae, but instead relied on his LinkedIn account profile that he had prepared three years earlier. (N.T. 15; Stipulated Exhibit 2.)

3. Although Moe testified on direct examination that he had inspected over 250 slate roofs (N.T. 12), he admitted on cross-examination that his LinkedIn page did not state that he had inspected over 250 slate roofs. Moe further admitted that his LinkedIn page did not state that he had experience as actually doing roofing work, had experience as a slate roofer, had replaced valleys on slate roofs, or had installed slate roofs (N.T. 16)

4. When asked if he had any personal accreditations or memberships in roofing associations, Moe testified that he had taken Jenkins' Slate Roofing Contractors

Association ("SRCA") course in 2015 (after the hail storm and after he prepared the Gillespie Proposal). (N.T. 17.) Moe admitted that although he had completed the SRCA course, he was not accredited. (N.T. 57-58.)

5. Jenkins testified that the SRCA seminar Moe attended was "a training session on slate--basic slate roof installation only. . . It had nothing to do with repair restoration." (N.T. 92-93.)

6. Moe's LinkedIn page stated that he worked for Metro Public Adjustment from October 2006 to December of 2012. Moe admitted that he had never worked for Metro Public Adjustment. (N.T. 49.)

7. Moe admitted that he had not started working for Gillespie until June of 2014 which was after the hail storm of May 22, 2014. (N.T. 50.)

8. Moe admitted that he had not provided Plaintiff's counsel with information that he had worked for CMR Construction and Roofing, prior to working for Gillespie. (N.T. 50.)

9. Moe admitted that his LinkedIn profile stated that one of his goals is to increase revenue for Gillespie. (N.T. 18.)

10. When asked on cross where in his LinkedIn profile does it indicate that he is a qualified expert on slate roofing, Moe replied, "I don't believe this case has—this case is more about policy and direct physical loss by hail damage, than to be a qualified state roofer." (N.T. 18.)

11. Moe testified that his expertise in slate roofing is based on "working hand in hand with adjusters across the board, including [State Farm], and found a balance." (N.T. 19.)

12. Moe testified that his expertise in slate roofing is also based on being the "point person for the company that's been hired by [Plaintiff], and has worked with [State Farm] throughout the--- entire process from—2014." (N.T. 19-20.)

13. Moe testified that he gained his experience in slate roofing by "working with Gillespie Contracting hand in hand with their expert installers for the last three years." (N.T. 21.)

14. Moe admitted that when he initially inspected the Property, he did not physically walk the roof. (N.T. 26.)

15. Moe testified that when he looked into Plaintiff's claim, "we recognized hail up to, you know, two, two and a half inches." (N.T. 25.)

16. Moe testified that during his inspection of the roof of the Property, he noticed "sporadic hits" or indentations on the "gutters, which were copper, and on the copper flat seam dormers, as well as the valleys." (N.T. 26.)

17. Moe testified that there were a "few hits on the copper turret finial." According to Moe, "most of the damage [was] to the soft metal." (N.T. 27.)

18. Moe testified that certain flat copper panels on the roof revealed "clear indications of hail right away." (N.T. 32.)

19. Moe testified that nothing besides hail could have caused this type of damage to the flat copper panels. (N.T. 32.)

20. Moe testified that after he showed these hits to the State Farm adjustors, they wrote up to replace all of the soft metals on the Property. (N.T. 34.)

21. Moe testified that he observed "minimal damage" to the actual slates. (N.T. 35.)

22. Moe identified hail damage to a corner of a shingle pictured on page 10 of Jenkins' report, a small chip to the top of a ridge pictured on page 14 of Jenkins' report and marks to a valley pictured on page 20 of Jenkins' report (N.T. 35-36.)

23. Moe testified that in order to repair the gutters, "You'd have to take up the first three courses, and you'd have to intertwine the repairs. What we were finding, that because of the snow guards, that it was going to actually interfere with that repair process as well. It kept escalating the number of repaired slates, so we line itemed out in our repair estimate basically anything that was new construction as far as installing brand-new rows of slate versus actually having to do single nail bid repairs to intertwine." (N.T. 39.)

24. Moe testified that in order to repair the valleys, "You're going to have to take out the slates to the left and right of the adjacent valley, so that you can expose the copper, remove it, and actually put a new piece down. We only cleat, so you're going to need an extra few inches there on the sides as well. And then your install is going to be from the very bottom of the valley all the way up, so it's going to require taking out at least probably two to three slates, horizontally, going all the way up the valley." (N.T. 39-40.)

25. Moe testified that in order to repair the broken slate tiles that were scattered throughout the roof, "Well, you're going to need to stage yourself correctly to get up there, so, you know, chicken ladder, something like that. You're going to have to take a slate ripper, pull out the nails, you're going to have remove the slate. Typically, you know, we find that, you know, it can be done by merely breaking just that slate, but oftentimes, depending on how tight the joints are, you'll break

adjacent slates, or the ones above or below it, and –And then you'd actually have to drill a hole into the new slate. Hopefully, it's a correct match. We have tried to find the closest available match that we could, and it was definitely, like, four or five shades off, so I know it stands out quite a bit in the repair slate right in the front of her home. And then you'd have to single nail in the bib or you could use a hook repair method as well." (N.T. 40.)

26. Both Moe and State Farm's adjuster, Dickey agreed that there was hail damage to the front, rear, left, and right elevation copper. (Exhibit P-3)

27. Moe testified that Moore agreed both verbally and by text message with the entire estimate contained in the Gillespie Proposal. (N.T. 43.)

28. Moe testified that Moore agreed there was hail damage to the roof. (N.T. 43.)

29. Moe testified that no one from State Farm disagreed with him that there was hail damage to the roof. (N.T. 43.)

30. Moe testified that there is no doubt in his mind that hail damaged the roof of the Property. (N.T. 48.)

31. Moe testified that that the difference in price between the Gillespie Proposal and State Farm's estimate occurred because "the adjuster wasn't aware of the actual slate work that had to be done to fulfill the scope of the loss. . ." (N.T. 51.)

32. Moe did not provide an expert report. Instead, he claimed the Gillespie Proposal served as his expert report. (N.T. 50.)

33. Moe testified that he and Arnwine prepared the Gillespie Proposal. (N.T. 52.)

34. Moe admitted that his name does not appear anywhere on the Gillespie Proposal. (N.T. 52.)

35. The Gillespie Proposal identified a Slate Foreman, Secondary Slate Foreman, Copper-work manager and Project Manager/coordinator (Arnwine) all of whom would be working on the Property. Moe is not identified anywhere in the Proposal. (Stipulated Exhibit 4.)

36. Moe admitted that the Gillespie Proposal also does not state who inspected the Property or how many times anyone did so. (N.T. 52-53.)

37. Moe admitted that it is common in making slate roofing repairs to remove slate and reuse it. (N.T. 55.) Yet, the Gillespie Proposal called for removing "9 Dormer Flat Seams and Slate surrounding, Replace with S-1 New Slate . . ." (Stipulated Exhibit 4.)

38. Moe admitted that the Gillespie Proposal did not contain any reference to the overall condition of the roof. (N.T. 61.)

39. Moore's claim log of 5/30/15 stated, "Based on the amount of slate tiles being replaced due to wind damage and also due to breakage factor for repairs around hail damage, copper dormers, chimney flashing, pipe boots, and valley metals, I have updated the State Farm estimate to include replacement of entire roof due to existing slate being unavailable as noted in previous file note." (N.T. 64;Ex. P-3.)

40. Moe was told by Moore via text message that the dollar amount of the claim would be $89,625.00, "pending management approval." (N.T. 65.) Moore calculated the estimate using the Gillespie Proposal.

41. State Farm never provided Moe with an approved estimate. (N.T. 65.)

42. Jenkins prepared a seven-page curriculum vitae, detailing his professional experience, professional affiliations, education, travel experience, presentations, radio spots, interviews, recognition and awards, reviews, self-published articles, written works, and a sampling of projects and clients. (ECF 33-5.; Stipulated Exhibit 5.)

43. Jenkins testified that he started working on slate roofs in 1968 as a roofer's helper. (N.T. 67.)

44. After running a contracting business, Jenkins changed his contracting business in 1980 to a slate roofing business which he operated for 35 years. (N.T. 68).

45. In 1997, Jenkins authored and published the first edition of "The Slate Roof Bible." (N.T. 68.)

46. In 1998, Jenkins started doing consulting work regarding slate roofs. (N.T. 68.)

47. In 2005, Jenkins authored and published the second edition of "The Slate Roof Bible." (N.T. 69.)

48. In 2005, Jenkins founded the SRCA) (N.T. 69.)

49. Jenkins is currently executive director of the SRCA. (N.T. 69.)

50. In 2016, Jenkins authored and published the third edition of "The Slate Roof Bible" which has received 10 national and/or international book awards. (N.T. 68-69).

51. Jenkins publishes the "Traditional Roofing Magazine" which is focused primarily on slate roofs and is available online for free download. (N.T. 69.)

52. Jenkins has been accepted as a slate roofing expert in the United States and Canada, testifying for homeowners, roofing contractors, property owners and insurance companies. (N.T. 70-71.)

53. Jenkins has spoken throughout the United States and abroad regarding slate roofs. (N.T. 71.)

54. Jenkins testified that he was retained by State Farm to "survey the roof, which means to inspect it, look at it, and assess and determine the conditions of the roof, especially with respect to weather damage, particularly hail damage, and possibly wind damage, and then write up a report outlining my evaluation and my determinations." (N.T. 71.)

55. Jenkins inspected the roof by getting on the roof. (N.T. 73.)

56. Jenkins prepared an extremely detailed 51-page Slate Roof Survey and Conditions Report (the "Report"). (Stipulated Trial Exhibit 6.)

57. Jenkins testified that he did not determine whether or not there was a hail event on May 22, 2014. (N.T. 94.)

58. Regarding the condition of the roof, Jenkins testified that "the condition, in a sentence or two, is it's a nice roof, the slate is rare and very high quality, but the roof is neglected and it has issues, mainly exposed nail heads, flashing deterioration, but weather damage was -- the only weather –- weather damage, per se, that I could see, was gutter damage caused by ice and snow sliding off the roof, and that problem was caused by incorrect installation of the gutters." (N.T. 72.)

59. Regarding Figure 4, Page 9 of the Report, Jenkins testified, "that's the same chimney, the flashing is cracked. Well, first off, it was tarred over, and then cracked open. So that's a source of leakage. Water will run down the side of a chimney, and if it has a piece of flashing popped out from the side like that, it acts basically, like, a funnel, water then runs down inside." (N.T. 74.)

60. Regarding Figure 3 Page 8 of the Report, Jenkins testified, "-- this is the ridge area above the chimney from where I'm taking the photograph, and you can see these nails sticking out all over the place, this is a common source of leakage on old roofs. So my determination for that particular leak was these two sources, the nails and the flashing." (N.T. 74.)

61. Jenkins testified that "hail does not cause this type of damage." (N.T. 74-75.)

62. Regarding the missing slate tile alluded to by Moe in Figure 5, page 10 of the Report, Jenkins testified that if hail had caused that shingle to fall out, he would have expected to see "[h]ail damage on the rest of the roof." (N.T. 75.)

63. Jenkins testified that "[i]f this was a hail –- if I thought this was a hail damage event, I would show -- I would prove it by showing other damaged slates in the area, and there aren't any, zero." (N.T. 117-118.)

64. Jenkins testified that a hailstorm would never leave a single puncture hole and that if large hail had damaged the roof, the damage would be obvious. (N.T. 126.)

65. Figure 47 on page 50 of the Report showed the difference between a slate tile that contained a hole not caused by hail and a slate tile that contained a hole caused by hail. Specifically, Jenkins testified, "Well, if you look at the top of that

page 50, where it says impact side, that drawing, when you impact a piece of slate, the backside of it breaks out, so the crater side is opposite the impact side. And if you see a hole in a piece of slate with a crater facing you, that's a hole that's originated from the underside of the slate. That happens when, for example, a nail head pushes itself through the slate, or you see it on barns a lot, because the farmers will go in there and shoot pigeons and they blow holes through their roof, you'll see the crater. If the impact side is from the outside, it'll —- you'll have a sharp edge, so the photos below that drawing show a hole with a crater, which is not hail damage, and a hole with a sharp edge, that's a hole that was impacted from the outside. . .-- if you drop down and look at the picture below, those holes are -- all have sharp edges, and the impact was from the outside, so they were caused by something, possibly hail that impacted that roof. Likely hail, because if you look at the air vent beside it, beside those holes, it's all banged up, and this is a case where I inspected this roof for hail damage, and I definitely found hail damage, and this is an example of that  hail damage on that roof. (N.T. 76-77.)

66. Jenkins testified that if hail were to hit the edge of slate, it can break off the slate rather than cause a hole in the slate (N.T. 106.)

67. Jenkins admitted that he did not address the broken slates in his expert report. (N.T. 111.)

68. Jenkins confirmed that hail damage would be obvious, like dents in the soft metal and breaks to the slate. (N.T. 106, 129.)

69. Jenkins testified that he did not see any hail impact indentations on Plaintiff's roof. (N.T. 77.)

70. Jenkins testified that If there was significant hail damage, the metal on roof would be "all dented up." (N.T. 78.)

71. Jenkins admitted that the soft metal contained isolated dents "here and there." (N.T. 110.)

72. Jenkins added, "but generally speaking, there aren't—it is not a dented roof. There are spots on it. These spots may appear to be dents, but they're not, they're spots. There are also some outward dents from something underneath that metal that they –- probably nail heads that they didn't pound down well enough when they put their copper on. So when I look at this, I'm looking for hail damage, and I would expect dents to be scattered, you know, all over the roof, or at least more than two inward dents, and when I see two inward dents like that, I think it was –- had something to do with the installation, walking on it, kneeling on it, you know, whatever." (N.T. 79.)

73. Page 38 of the Report indicated that Jenkins found only one external impact hole on the entire roof.  According to Jenkins, "I could find no hail damage on this roof, and no wind damage. There was one slate that has a hole in it, and I show a picture of it, that would be typically what you would find with hail damage. That particular slate, that one hole, and one slate, was located underneath a large pine tree, and, in fact, let's just take a look at that, while I'm talking about, so you can see what I'm talking about, I've got to find it here, but--So there's-- there a couple of things here worth noting. One is, that there is a big tree, a big pine tree

directly overtop of this area, and all you need is a branch to fall to poke that hole. You can see the shape of the hole, it's irregular, it's unlikely caused by hail, because first off, there's a big tree overtop, and how's hail going to get through that tree? Secondly, it's an irregular hole, probably caused by a branch. Thirdly, that valley appears to have been replaced, and not original, and the way I know that is, on the top picture, to the left of the red circle, in between the slates, you can see the bib flashings, that little brown patch is between the slates, that means they pulled those slates out, and put them back in, and the reason they pulled them out, and put them back in, is –- was to replace the valley. So it's possible that between the tree, and the workers, that slate could have been punctured by something, but unlikely, highly unlikely, that it would have been a hailstone that did that, and that was the only hole—the only hole on the entire roof." (N.T. 80-82.)

74. Jenkins disagreed that any slates on the roof needed to be replaced. Specifically, Jenkins testified, "What the estimator stated in this estimate, his $90,000 estimate, was that these slates had to be taken out and replaced with different slates, and that it was going to make the roof look bad, but that's completely false. The slates would [be] taken off of this –- these flashings, the flashings pulled out, replaced, and the same slates put back in the exact same positions. . . So I think it's very important for the Court to understand here, that the estimator didn't apparently –- wasn't apparently aware of this normal procedure for flashing replacement, and that's how this estimate got so inflated.

They were —- they were calling for the replacement [of] over a thousand slates on this roof, when that was completely unnecessary." (N.T. 85-86.)

75. Jenkins testified that if any metal needed to be replaced on the roof, the acceptable procedure is to "pull out the original slates, put in new metal, put the original slates back in the same place, often the nails go in the same nail holes, and when you're done, it looks good, there's nothing there that looks like patchwork." (N.T. 85.)

76. Jenkins opined that the metal on the roof did not need to be replaced. Specifically, Jenkins testified, "–- in fact, let's just cut to the chase here, the metal didn't need to be replaced, unless it was damaged by hail, and I saw no hail damage on that metal." (N.T. 86.)

77. With regard to a hole on one of the gutters pictured on page 40 of the Report that Moe testified was caused by hail damage, Jenkins testified, "That —- when I see that, I -- somebody leaned a ladder there, somebody put a ladder and banged it on that gutter, that's —- that's what that is. That's a rolled bead, it's very difficult to dent. You'd have to use a hammer or something like that. If a hailstone came at that angle, which would have to be a low angle, and hit that front bead of that gutter, and dented to that extent, why would there be no damage to the roof above it? I mean, it just doesn't make any —- There's a dent in front of that gutter, which would have to be hit at a---from a horizontal angle." (N.T. 87-88.)

78. Regarding the pictures of gutters on the Property on pages 40 and 41 of the Report, Jenkins testified that "the gutters [were] hung way too high" and as a

result anything that slid off the roof would end up striking and damaging the gutters. (N.T. 90.)

79. Regarding the picture of a gutter at the Property on page 42 of the Report, Jenkins testified, "Mr. Moe said that there was no way to hang the –- replace the gutters without taking all the slates off. Well, taking all the slates off and putting them back on is routine work in the slate roofing trade, it's no big deal. A lot of times there's a building gutter, which goes completely up under the slate, and to take that out, or reline it, you pull off the slates, replace the liner, put the slates back down. You don't have to replace the slates with new slates." (N.T. 89.)

80. Regarding the picture of the inside of gutters at the Property on page 44 of the Report, Jenkins testified, "if there was a massive hail event of any kind, you would see dents in there, and there aren't any –- I didn't see any dents anywhere." (N.T. 91-92.)

81. Finally, Jenkins testified, "As a slate roof expert who's worked on over a thousand roof[s], 1,500 roofs, I found no hail damage on this roof. No hail damage at all. And no -- no wind damage either –-the damage that I did find was routine maintenance, and that's the problems that  -- that this roof has." (N.T. 93.)

82. Jenkins was the only individual who concluded that Plaintiff's roof did not sustain any hail damage. Moe and State Farm specialists Dickey and Moore all found hail damage.

In Pennsylvania, the insured has the burden "to establish coverage under an insurance policy." *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206 (3d Cir.

2001). If the insured does so, the burden shifts to the insurer to establish an applicable

exclusion to coverage. *Id.* Exclusions are "strictly construed against the insurer and in

favor of the insured." *Id.* at 206-07.

> The Policy provides, in pertinent part:

> COVERAGE A-DWELLING
> We insure for accidental direct physical loss to the property
> described in Coverage A, except as provided in SECTION I
> – LOSSES NOT INSURED.

Stipulated Trial Exhibit  1.

> Although the term "accidental" is not defined in the Policy, the term is

generally defined in the context of insurance contracts as follows:

> An accident within accident insurance policies is an event
> happening without any human agency, or, if happening
> through such agency, an event which, under circumstances,
> is unusual and not expected by the person to whom it
> happens. A more comprehensive term than 'negligence,' and
> in its common signification the word means an unexpected
> happening without intention or design.

Black's Law Dictionary 15 (6th ed. 1990.)


> Plaintiff claims she suffered an accidental direct physical loss to the roof of

her Property as the result of hail and/or wind.   Defendant denies that Plaintiff suffered

an accidental direct physical loss to the roof as the result of hail or wind, but instead

claims that any loss was the result of poor maintenance. As noted above, the parties

have stipulated that the issue for the Court to decide is whether the reported damages

to the slate roof at the Property were the result of the May 22, 2014 hail storm.

(Stipulation of Facts ¶ 22.)

The contrast in the credentials of the two experts could not have been starker. On the one hand, Moe did not prepare an actual curriculum vitae for the Court to assess his qualifications as an expert, but instead relied on his "LinkedIn" page that he admitted he prepared three years earlier. Moe also did not prepare an expert report, instead relying on the Gillespie Proposal which Moe admitted does not even contain his name.

Further, Moe suffered from a credibility problem, particularly regarding his claims of expertise in slate roofing repair and restoration. Although Moe testified on direct examination that he had inspected over 250 slate roofs, he admitted on cross examination that this information was not contained on his LinkedIn page. Moe further admitted that his LinkedIn page did not state that he had experience as actually doing roofing work, had experience as a slate roofer, replaced valleys on slate roofs and had installed slate roofs, In addition, while Moe's LinkedIn page stated that he worked for Metro Public Adjustment from October 2006 to December of 2012, Moe admitted on cross examination that he had never worked for Metro Public Adjustment.

Moe also admitted that he had not started working for Gillespie until June of 2014 which was after the hail storm of May 22, 2014. Moe admitted that he had not provided plaintiff's counsel with information that he had worked for CMR Construction and Roofing, prior to working for Gillespie. Finally, Moe admitted that although he had taken Jenkins' SRCA accreditation course in 2015, he was not accredited in slate roofing.

On the other hand, Jenkins literally wrote the book on slate roofing, having authored and published three editions of "The Slate Roof Bible." Jenkins also publishes the Traditional Roofing Magazine which focused primarily on slate roofing. In 2005, Jenkins founded the SRCA which became incorporated as a trade association of which he is executive director. Jenkins also operated a slate roofing contracting business for 35 years. Jenkins has also given numerous presentations, radio spots, interviews as well as written several self-published articles and other works.

Given Jenkins's superior credentials and credibility, the Court credits his testimony that any damage to plaintiff's roof was caused by failure to properly maintain the roof and was not caused by hail or wind damage.

Specifically, Jenkins inspected the roof by getting on the roof. He did not observe any impact indentations from hail on plaintiff's roof. He observed only two inward dents in the soft metal and testified that if the metal was damaged by hail, the metal would be "all dented up."

He observed instances of neglect such as exposed nail heads and flashing deterioration around one of the chimneys which he testified would explain the leakage plaintiff had complained about.

With regard to the missing shingle, Jenkins opined that hail would not cause a single slate tile to fall out without damaging additional slate tiles in the same area.

Although Jenkins observed one slate tile with an indented hole in it, he noticed that this particular tile was directly under a large pine tree which made it unlikely that hail would have passed through the pine tree and put a hole in the slate tile

Jenkins also noticed that the indentation was irregular in shape which also made it unlikely that it came from hail as opposed to a branch falling from the pine tree.

Jenkins opined that none of the soft metal needed to be replaced because he did not see any damage to the soft metal from hail.

With regard to the gutters, Jenkins noted testified that the gutters were hung too high.  As a result, according to Jenkins, any damage to the gutters was caused by ice and snow sliding off the roof and impacting the gutters. He also noted that there were no indentations in any of the slate tiles around the damaged areas of the gutters. He also testified that he did not see any dents on the inside of the gutters which he testified would have occurred had there been a massive hail event. Finally, Jenkins testified that a hole on the side of one of the gutters could not have come from hail because in order to make such a hole, the hailstone would have had to come from a horizontal angle.

Finally, Jenkins disagreed with the Gillespie Proposal that over 1000 slate tiles needed to be replaced. Instead, according to Jenkins, "You pull  out the original slates, put in new metal, put the original slates back in the same place, often the nails go in the same  nail holes, and when you're done, it looks good, there's nothing there that looks like patchwork.  What the estimator stated in this estimate, his $90,000 estimate, was that these slates had to be taken out and replaced with different slates, and that it was going to make the roof look bad, but that's completely false. The slates would taken off of this –- these flashings, the flashings pulled out, replaced, and the same slates put back in the exact same positions. . . So I think it's very important for the Court to understand here, that the estimator didn't apparently –- wasn't apparently

aware of this normal procedure for flashing replacement, and that's how this estimate got so inflated.  They were –- they were calling for the replacement [of] over a thousand slates on this roof, when that was completely unnecessary."

Jenkins testified that the damage to the roof was not caused by hail or wind, but by poor maintenance. The Court finds Jenkins' testimony and expert report to be credible. Accordingly, plaintiff has not established coverage under the Policy and judgment is entered in favor of the Defendant and against the Plaintiff.